Guy B. Wallace (SBN 176151)
Mark T. Johnson (SBN 76904)
Travis C. Close (SBN 308673)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile:  (415) 421-7105
gwallace@schneiderwallace.com
mjohnson@schneiderwallace.com
tclose@schneiderwallace.com

Jinny Kim (SBN 208953)
Alexis Alvarez (SBN 281377)
LEGAL AID AT WORK
180 Montgomery Street, Suite 600
San Francisco, California  94104
Telephone: (415) 864-8848
Facsimile: (415) 593-0096
jkim@legalaidatwork.org
aalvarez@legalaidatwork.org

Shawna L. Parks (SBN 208301)
LAW OFFICE OF SHAWNA L. PARKS
4470 W. Sunset Blvd., Ste. 107-347
Los Angeles, CA 90027
Telephone: (323) 389-9239
Facsimile:  (323) 389-9239
sparks@parks-law-office.com

Attorneys for Plaintiffs and the putative Class

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STUDENT A, BY AND THROUGH PARENT A, HER GUARDIAN; STUDENT B, BY AND THROUGH PARENT B, HIS GUARDIAN; STUDENT C, BY AND THROUGH PARENT C, HIS GUARDIAN; STUDENT D, BY AND THROUGH PARENT D, HER GUARDIAN, STUDENT E BY AND THROUGH PARENT E, HER GUARDIAN, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>                PLAINTIFFS,<br><br>V.<br><br>SAN FRANCISCO UNIFIED SCHOOL DISTRICT; VINCENT MATTHEWS, IN HIS OFFICIAL CAPACITY AS THE SUPERINTENDENT FOR THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT,<br><br>                DEFENDANTS. | Case No. _____<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. §§ 1400, *et seq*.; SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794; TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. §§ 12131, *et seq*.** |

**INTRODUCTION**

1. This civil rights lawsuit, brought under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the Americans with Disabilities Act of 1990 ("ADA"), challenges Defendants' systemic and ongoing failure to provide students with disabilities with a non-discriminatory and free appropriate public education.

2. Federal and state laws require Defendants to: (1) identify, locate and evaluate every child who may have a disability; (2) provide procedural safeguards to children with disabilities and their parents; (3) consider data that demonstrate that prior, or as part of the referral process, students are provided appropriate instruction by qualified personnel; (4) comprehensively evaluate students to determine whether they are eligible for special education and related aids and services; (5) offer and develop an Individualized Education Program ("IEP") (after determining eligibility) with effective special education and related aids and services, including appropriately intensive research-based interventions; and (6) monitor the efficacy of the special education and related aids and services provided to students, hold annual IEP meetings and more as needed to review progress and make changes or revisions to IEPs where necessary to ensure a free appropriate public education ("FAPE").

3. Plaintiffs bring this action on behalf of themselves and the thousands of members of the class, defined below, for declaratory and injunctive relief to require Defendants to provide legally-mandated services to schoolchildren with suspected disabilities and disabilities. Defendants have a policy and practice of delaying and/or denying the identification and evaluation of children with disabilities as mandated by the IDEA. Even after Defendants conduct an evaluation of a child, they fail to inform either the children or their parents of the range of services and accommodations that are necessary to address the child's disability or disabilities. Instead, Defendants have a policy and practice of offering parents of disabled children a standard set of accommodations and services without regard to whether this standardized approach will provide the services or accommodations that are necessary for the children with disabilities to progress and to receive FAPE. Moreover, with respect to the limited set of services and accommodations that Defendants do offer to provide, Defendants impose arbitrary limits or

1  ceilings on the quantity of those services and accommodations without regard to whether those

2  limitations will allow children with disabilities to progress and to receive a FAPE.  In addition,

3  Defendants routinely fail to provide the services and accommodations specified in the IEPs of

4  children with disabilities, and routinely violate the procedural safeguards mandated by the IDEA

5  and its implementing regulations.  On information and belief, Defendants' violations of IDEA,

6  Section 504 and the ADA as set forth herein are systemic and widespread and impact thousands

7  of children with disabilities and their families; they are not isolated instances of discrimination.

8       4.       Defendants' failures are long-standing, willful and egregious violations of civil

9  rights under federal laws that ensure the right to free appropriate public education for students

10  with disabilities.  Defendants' policy, pattern and practice of violating the IDEA, Section 504 and

11  the ADA have resulted in the widespread denial of services and accommodations to children with

12  disabilities in the San Francisco Unified School District ("SFUSD"), and have a profound

13  negative impact on students with disabilities by denying them a free appropriate public education

14  as mandated by federal disability civil rights law.  As a result of Defendants' wrongful conduct,

15  Plaintiffs and members of the proposed class have suffered and continue to suffer injury,

16  including, but not limited to, the denial of FAPE and the denial of meaningful and equal access to

17  the benefits of a public education program.

18       5.       This lawsuit seeks an end to this systemic discrimination against students with

19  disabilities.  Plaintiffs have no adequate remedy at law and, unless Defendants are preliminarily

20  and permanently enjoined, Plaintiffs will continue to suffer irreparable harm as a result of the

21  denial of their civil rights under the IDEA, Section 504 and the ADA, and will continue to be

22  denied the services and accommodations that are necessary to and a precondition of receiving a

23  FAPE.  Plaintiffs seek declaratory and injunctive relief as set forth below, including an injunction

24  ordering Defendants to comply with the requirements of the IDEA, Section 504 and the ADA.

25  Such injunctive relief should include, *inter alia*, an order requiring that Defendants:  (1) reform

26  their deficient policies, procedures and practices for all students with disabilities within the

27  District; (2) require and provide appropriate training for all staff; (3) establish and implement new

28  and effective procedures for identifying and evaluating those students in need of evaluations; (4)

establish and implement a policy and procedure for pro-actively communicating to parents of

students with disabilities the full range of available accommodations and services that may be

effective in ensuring that their children achieve progress within the meaning of applicable law;

and (5) cease their policy and practice of imposing arbitrary limits and ceilings on the provision

of amounts of certain types of accommodations and services thereby denying FAPE.  In addition,

the named Plaintiffs seek restitution of their uncompensated out-of-pocket expenses for paying

for services and accommodations that the District failed and refused to provide in violation of the

IDEA, Section 504 and the ADA.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and §§ 1343(a)(3) and (4), as this is an action for injunctive and declaratory relief brought

pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*,

and its implementing federal regulations, 34 C.F.R Part 300; Section 504 of the Rehabilitation Act

of 1973 ("Section 504"), 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Pt. 104;

and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, and its

implementing regulations, 28 C.F.R. Pt. 35.

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 2201.

8.     The Northern District of California has personal jurisdiction over Defendants.  All

of the acts complained of, which gave rise to the claims alleged, occurred in this State and in this

District.

9.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§

1391(b)(1) and (b)(2).

10.    Defendants reside in the Northern District of California and a substantial part of the

events or omissions giving rise to this action arose in the City and County of San Francisco,

which is located within the Northern District of California.

11.    Members of the Class reside in the Northern District of California.  The Plaintiffs

reside in the Northern District of California.

## **PARTIES**

12.    Plaintiffs are students with disabilities within the meaning of the IDEA, Section 504, and the ADA who have tried to obtain necessary special education and related services from Defendants but have been deprived of access to these services because of Defendants' systemic violations of the IDEA, Section 504 and the ADA.  Defendants have continuously failed and refused to provide Plaintiffs and other similarly situated students with FAPE.

13.    Student A:  Plaintiff Student A is a nine-year-old third grade student who attended a SFUSD elementary school.  Student A resides with her guardian, Parent A, in the City and County of San Francisco, California, and comes within the jurisdiction of SFUSD.  Student A has been diagnosed with a specific learning disorder (SLD) in the areas of reading (dyslexia) and math that entitle her to services under IDEA, Section 504, and the ADA.  Student A attended a SFUSD school and may return to SFUSD if Defendants change its policies, procedures and practices so as to bring them into compliance with the requirements of federal and state disability nondiscrimination laws.

14.    Student B:  Plaintiff Student B is an eight-year-old second grade student at a SFUSD elementary school.  Student B resides with his guardian, Parent B, in the City and County of San Francisco, California, and comes within the jurisdiction of SFUSD.  Student B has been diagnosed with Autism and with a speech or language impairment that entitles him to services under IDEA, Section 504, and the ADA.  At the time of filing, Student B attends a SFUSD school and, as such, is qualified to participate in the programs, services, and activities of SFUSD.

15.    Student C:  Plaintiff Student C is a seven-year-old first grade student at a SFUSD elementary school.  Student C resides with his guardian, Parent C, in the City and County of San Francisco, California, and comes within the jurisdiction of SFUSD.  Student C has been diagnosed with Autism that entitles him to services under IDEA, Section 504, and the ADA.  At the time of filing, Student C attends a SFUSD school and, as such, is qualified to participate in the programs, services, and activities of the SFUSD.

16.    Student D:  Plaintiff Student D is a twelve-year-old sixth grade student at a SFUSD charter school.  Student D resides with her guardian, Parent D, in the City and County of San

Francisco, California, and comes within the jurisdiction of SFUSD. Student D has been diagnosed with a SLD in the area of reading (dyslexia) that entitles her to services under IDEA, Section 504, and the ADA. At the time of filing, Student D attends a public charter school and, as such, is qualified to participate in the programs, services, and activities of the SFUSD.

17. Student E: Plaintiff Student E is an eight-year-old third grade student at a SFUSD elementary school. Student E resides with her guardian, Parent E, in the City and County of San Francisco, California, and comes within the jurisdiction of SFUSD. Student E has been diagnosed with a SLD in the area of reading (dyslexia) that entitles her to services under IDEA, Section 504, and the ADA. At the time of filing, Student E attends a SFUSD school and, as such, is qualified to participate in the programs, services, and activities of the SFUSD.

18. Each Plaintiff has standing to bring this action to enforce Section 504 pursuant to 29 U.S.C. § 794a(a)(2), which provides that, "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance.

19. Each Plaintiff has standing to bring this action to enforce ADA pursuant to 42 U.S.C. § 12133, which provides that "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

20. Defendant SFUSD is a government agency responsible for providing school children with full and equal access to the public education programs and activities it offers in compliance with the requirements of federal and state laws and regulations. Defendant SFUSD is chartered and incorporated under California law and is a recipient of federal financial assistance. Defendant SFUSD's responsibilities include making and implementing educational decisions for the schools within its jurisdiction.

21. Defendant Vincent Matthews is the Superintendent of SFUSD. Defendant Matthews is appointed by the Board of Education to implement policies created by the Board of Education and/or mandated by federal and state laws and regulations. Defendant Matthews is responsible for ensuring that children are provided equal access to public education programs and

activities offered by SFUSD.  Defendant Matthews is also responsible for ensuring that all

eligible children with disabilities are provided a FAPE, including special education and related

aids and services in compliance with federal and state laws and regulations.  Defendant Matthews

is sued only in his official capacity.

## STATUTORY FRAMEWORK

22.     IDEA, Section 504, and the ADA require that California school districts offer a

FAPE to children identified as disabled under those laws.  The ADA requires that no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, such as a school,

or be subject to discrimination by such entity.  42 U.S.C. § 12132.

## IDEA

23.     IDEA is a federal grant program administered by the U.S. Department of Education

("DOE").  20 U.S.C. §§ 1400, *et seq.*  States, including California, that receive DOE funds must

comply with the mandates contained in IDEA and its implementing regulations.  In turn, school

districts must comply with IDEA and meet IDEA-standards established by the state education

agency, which in California is the California Department of Education.  20 U.S.C. § 1401(9)(B).

24.     IDEA's primary mandate is the guarantee that "all children with disabilities have

available to them a [FAPE] that emphasizes special education and related services designed to

meet their unique needs and prepare them for further education, employment, and independent

living."  20 U.S.C. § 1400(d)(1)(A).

25.     To carry out this broad mandate, Defendants must have in effect policies,

procedures and programs to ensure that all children who are in need of special education and

related aids and services are identified, located, evaluated and provided a specially-designed

Individualized Education Program ("IEP").  The specific mandates of IDEA require Defendants

to:  (1) identify, locate and evaluate every child suspected of having a disability, residing in the

district's jurisdiction ("Child Find Duty"); (2) provide procedural safeguards to children with

disabilities and their parents ("Procedural Safeguards Duty"); (3) consider data that demonstrate

that prior, or as part of the referral process, students were provided appropriate instruction by

1  qualified personnel ("Appropriate Instruction by Qualified Personnel Duty"); (4)

2  comprehensively evaluate students to determine whether they are eligible for special education

3  and related aids and services ("Evaluation Duty"); (5) after determining eligibility, offer and

4  develop an IEP with effective special education and related aids and services, including

5  appropriately intensive research-based interventions ("Special Education Duty"); (6) implement

6  properly prepared IEPs; and (7) monitor the efficacy of the special education and related aids and

7  services provided to students, hold annual IEP meetings and more as needed to review progress

8  and make changes or revisions to IEPs where necessary to ensure FAPE in the least restrictive

9  environment (LRE) ("Monitoring Duty").  20 U.S.C. §§ 1400, *et seq*.; 34 C.F.R. Pt. 300.

10  ## CHILD FIND AND EVALUATION DUTIES

11  26.    One of the specific mandates of IDEA is that "children with disabilities residing in

12  the State and children with disabilities attending private schools . . . regardless of the severity of

13  their disabilities, and who are in need of special education and related aids and services are

14  identified, located, and evaluated . . . ."  20 U.S.C. § 1412(a)(3)(A).  This is known as the "Child

15  Find Duty."

16  27.    The Child Find Duty requires school districts to timely identify, locate, and evaluate

17  all children with suspected disabilities.  *Id*. § 1412(a)(3); 34 C.F.R. §§ 300.101(c), .111.  School

18  districts, thus, must fulfill their Child Find obligation; otherwise, a child who has a disability or

19  suspected disability under IDEA will not be identified and accordingly, will not receive

20  appropriate special education.

21  28.    Once a child is identified under Child Find, school districts must promptly seek

22  parental consent to evaluate him or her for special education, under mandated timeframes,

23  including when the child has not made adequate progress after an appropriate period of time when

24  provided with appropriate instruction.  20 U.S.C. §§ 1414(b)(6); 34 C.F.R. §§ 300.301,

25  300.309(c).  School districts must evaluate a child who is referred for an evaluation by a parent

26  unless they provide adequate written notice giving their reasons for refusal.  34 C.F.R. § 300.503;

27  Cal. Educ. Code § 56500.4.  IDEA requires school districts to conduct comprehensive "initial

28  evaluations" to "determine whether a child is a child with a disability" and "determine the

1  educational needs of such child."  20 U.S.C. §§ 1414(a)-(c); *see also* 34 C.F.R. § 300.301; Cal.

2  Educ. Code § 56320.  The results of this Evaluation Duty are used to determine the child's

3  eligibility for special education and related aids and services as well as to make decisions about

4  an appropriate educational program for the child.

5       29.  IDEA and its regulations establish a comprehensive process by which a child with a

6  disability must be evaluated.  The student's eligibility must be determined and an appropriate

7  program of special education and related aids and services must be developed and implemented.

8  With regard to the Evaluation Duty, a school district must use a variety of assessment strategies to

9  gather relevant information about the child and must assess the child in "all areas related to the

10  suspected disability."  34 C.F.R. §§ 300.304(b)(1), (c)(4).  Among the data to be considered, the

11  Evaluation Duty requires observations by teachers and related service providers; the school

12  district must produce this data at an IEP meeting.  *Id.* § 300.305.  The evaluation must contain

13  information from the child's parents and others who interact with the student on a regular basis.

14  20 U.S.C. §§ 1414 (b)(2)(A), (c)(1)(A).

15       30.  Within 60 days from the date that the parents provide written consent to an

16  evaluation of their child, school districts must complete the Evaluation Duty and hold an IEP

17  meeting.  Cal. Educ. Code § 56344(a).  School districts must have an IEP in place at the

18  beginning of each school year for every eligible child with a disability in its jurisdiction.  20

19  U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).

20       31.  The evaluation must encompass all suspected areas of the child's disability.  20

21  U.S.C. § 1414(a)(3)(B).  Evaluation results are then discussed with parents in an IEP team

22  meeting to determine if the child is eligible for special education.  *Id.* § 1414(a)(4).

23  **PROCEDURAL SAFEGUARDS DUTY**

24       32.  IDEA expressly includes certain procedural safeguards, requirements, and duties of

25  school districts to ensure meaningful parental participation, notification, and consent through the

26  special education process.  20 U.S.C. §§ 1400, 1412(a), 1414; Cal. Educ. Code §§ 56000, *et seq.*;

27  *see also* 34 C.F.R. Pt. 300.

28

33.     As part of the "Procedural Safeguards Duty," school districts must give parents prior written notice within a reasonable time before they propose or refuse to initiate or change the identification, evaluation, or educational placement or the provision of FAPE in the LRE to the child. 34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4.  Thus, school districts must obtain informed written parental consent in order to support an initial evaluation of a student and an initial provision of special education services.  Parental consent is further required to provide special education services and re-evaluations.  Parental consent means that the parent is "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication," and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought.  34 C.F.R. § 300.9.

34.     School districts must ensure that the parents of a child with a disability are members of the IEP team that makes determinations regarding eligibility (20 U.S.C. § 1414(b)(4)(a)) and any group that makes decisions on the educational placement of their child.  *Id.* § 1414(e); Cal. Educ. Code § 56342.5.  School districts must ensure that the parents are invited to each IEP team meeting and are afforded the opportunity to participate, which includes: (1) notifying parents of the meeting early enough to ensure that they will be able to attend; (2) provide information to parents; and (3) afford parents the opportunity to know the purpose of the meeting, who will participate, and to identify other representatives who should be invited. 20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. §§ 300.309(b)(2) and (c), .311(a)(7)(ii) and (b), .321, 300.327, 300.501(c).

## SPECIAL EDUCATION DUTY

35.     Once determined as eligible for special education, a student receives an IEP, developed by his or her IEP team.  20 U.S.C. § 1414.  Among other requirements, an IEP must include a "statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable," or other evidence-based programs, and a statement of modifications and accommodations needed.  *Id.* §§ 1414(d)(1)(A)(i)(IV-VI); 34 C.F.R. § 300.320(a)(4).  Further, to develop an IEP, the student's

IEP team must also consider special factors, which include a child's communication needs and "whether the child needs assistive technology devices and services."  20 U.S.C. §§ 1414(d)(3)(B)(vi)-(v); *see id*. § 1401(1).  In sum, the IEP requirement ensures that Defendants find an educational solution appropriate to the specific needs of the child, given his or her disability and circumstances.

## IMPLEMENT PROPERLY PREPARED IEPs

36.     The IEP is the centerpiece of the IDEA's education delivery system for disabled children. A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents); an IEP must be drafted in compliance with a detailed set of procedures.  20 U.S.C.S. § 1414(d)(1)(B).  These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. *Id*.  The IEP is the means by which special education and related services are tailored to the unique needs of a particular child.  Yet parents, necessary experts, special education representative or, in the alternative, general education representatives are routinely either excluded or missing.

37.     The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance, describe how the child's disability affects the child's involvement and progress in the general education curriculum, and set out measurable annual goals, including academic and functional goals, along with a description of how the child's progress toward meeting those goals will be gauged.  20 U.S.C. § 1414(d)(1)(A)(i)(I)-(III).  The IEP must also describe the special education and related services that will be provided so that the child may advance appropriately toward attaining the annual goals and be involved in and make progress in the general education curriculum.  20 U.S.C. § 1414(d)(1)(A)(i)(IV).

38.     Moreover, an IEP must aim to enable the child to make progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).  This reflects the broad purpose of the IDEA, an ambitious piece of legislation enacted in response to Congress's perception that a majority of disabled children in the United States were either totally excluded from schools or were sitting

idly in regular classrooms awaiting the time when they were old enough to drop out. *Bd. of Educ. v. Rowley*, 458 U. S. 176, 179 (1982) (quoting H. R. Rep. No. 94-332, p. 2 (1975)).  A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act. *Endrew F. v. Douglas Cty. Sch. Dist*. *RE-1*, 137 S. Ct. 988, 995-96 (2017).

## MONITORING DUTY

39.     IDEA mandates that a child with an IEP must have the IEP reviewed "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved."  20 U.S.C. § 1414 (d)(4)(A)(i).  Moreover, where there is a lack of expected progress toward the annual goals and in the general education curriculum, the IEP must be revised to reflect updated goals, strategies, and/or resources.  *Id*. § 1414 (d)(4)(A)(ii)(I).  School districts must regularly inform parents of their child's progress toward the annual IEP goals and their child must be reevaluated at their request and every three years.  *Id*. §§ 1414(a)(2)(A)(ii), (B)(ii).

## SECTION 504

40.     Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance.  29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . "  29 U.S.C. § 794(a).  Thus, Section 504 applies to all school districts that receive federal financial assistance, including SFUSD.  *Id*. § 794(b)(2); 34 C.F.R. § 104.31.

41.     According to Section 504's implementing regulations, school districts must "designate at least one person to coordinate its efforts to comply with this part."  34 C.F.R. § 104.7(a).  School districts must provide "appropriate education" to a "qualified handicapped person."  *Id*. § 104.33.  A student with a disability satisfies the definition of a "qualified handicapped person" if the student "(i) has a physical or mental impairment which substantially

limits one or more major life activities [such as learning or reading], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j).

42.     School districts must provide the student who is a "qualified handicapped person" with an "appropriate education," which is defined as "regular or special education and related aids and services that (i) are designed to meet the individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met, and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] §§ 104.34, 104.35, and 104.36." *Id.* § 104.33(b)(1).  School districts are required to provide these students with a "free appropriate public education" "regardless of the nature or severity of the person's handicap" and "with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person …unless…the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* §§ 104.33(a), .34(a).

43.     Before determining placement, school districts must evaluate the student who "needs or is believed to need special education or related services before taking any action" regarding the student's placement in regular education, special education, or any significant change in placement.  *Id.* § 104.35(a).  Once a student has been evaluated, school districts must consider data about the student and make placement decisions using information from a variety of sources, create procedures to ensure that the information obtained is documented and carefully considered, ensure that the placement decision is made by a group of people, including those knowledgeable about the student, the evaluation data, and placement options, and ensure that the student is educated with nondisabled peers to the "maximum extent appropriate" for the student. *Id.* § 104.35(c).

44.     Additionally, Section 504 prohibits school districts from discrimination against students who meet the definition of a "qualified handicapped person."  Specifically:

> [A] recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:  (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others; (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others; (iv) Provide different or separate aid, benefits or services to handicapped persons or to any class of handicapped persons with aid, benefits or services that are as effective as those provided to others; … or (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit, or service.  *Id.* §§ 104.4(b)(1)(i)-(iv), (vii).

45.     The regulations implementing Section 504 further state:

> A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same state.

> *Id.* § 104.4(b)(4).

46.     For aids, benefits or services to be "equally effective," students who are "qualified handicapped persons" must be given "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."  *Id.* § 104.4(b)(2).

## **TITLE II OF THE ADA**

47.     The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

48.     Title II of the ADA applies to all of the activities of public entities, including school districts that provide public education.

49. The implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . . ." *Id*. § 35.108.

50. The regulations implementing Title II of the ADA state that:

> [a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id*. § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

51. Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." *Id*. § 35.130(b)(3).

52. Title II of the ADA requires that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities. *Id*. §§ 35.130(b)(3), (8).

53. Further, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id*. §

35.130(d). This means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

## STATEMENT OF FACTS

## PLAINTIFF STUDENT A

54.     Student A is a nine year-old, third grade student who attended a public school in San Francisco.  Student A attended this SFUSD elementary school since kindergarten in the 2015-2016 academic year.   Student A has been diagnosed with SLDs in the areas of math, reading (dyslexia) and visual processing.  At all relevant times, she was and is entitled to special education and related aids and services from SFUSD as a resident of the City and County of San Francisco.

55.     Student A has been subjected to discrimination and denial of necessary services and accommodations as a result of, *inter alia*, (a) Defendants' failure to properly and timely identify and evaluate students who qualify for special education services; (b) Defendants' policy and practice of providing only a limited subset of services and accommodations to students with disabilities despite the fact that other additional services and accommodations are necessary; (c) Defendants' policy and practice of failing to provide the services and accommodations specified in the IEPs of students with disabilities, or of arbitrarily limiting or rationing the amounts of such services or accommodations that are provided to them; and (d) Defendants' policy and practice of denying procedural safeguards mandated by the IDEA and its regulations.

56.     Defendants failed to identify and evaluate Student A in a timely and proper manner as required by applicable law, and as set forth below.  Student A always loved books and enjoyed being read to but her parents noticed she lacked interest in pre-reading and writing development.  During the Fall of Student A's first grade year, Student A's parents suspected that their daughter may have a learning disability and requested an evaluation of Student A.  By this time, Student A was identified as reading and writing below grade level and started saying that she does not like reading anymore, called herself "stupid" and began shutting down whenever she had to complete reading assignments.  Student A entered the District in the fall of 2015.  Student A's special education evaluation was completed in January 2017.  As a result of Defendants' failure to timely

1   identify and evaluate her disabilities in a timely and proper manner, during the time between the

2   fall of 2015 and the first half of 2017, Student A was denied services and accommodations that

3   she needed because of her disabilities and that were necessary to a FAPE.

4       57.   An initial IEP meeting was held in January 2017 to determine Student A's

5   eligibility for special education and related aids and services.  At this meeting, Student A's IEP

6   team members reviewed her assessments.  The IEP team determined that Student A met the

7   eligibility criteria for a Specific Learning Disability and that she qualified for special education

8   and related aids and services.

9       58.   Defendants denied Student A services and accommodations that she needed

10   because of her disabilities and that were necessary to a FAPE, as set forth herein.  As specifically

11   stated in her January 2017 IEP, Student A demonstrates an instructional reading level below grade

12   level expectations.  Student A's IEP further stated that she struggles with sensorimotor processing

13   and fine motor skills.  Student A's IEP stated that she would be provided with 90 minutes of

14   literacy intervention per week; 120 minutes per week of paraprofessional support per week to

15   support her writing; 90 minutes per week of math support; and 30 minutes per week of

16   occupational therapy.  Student A was provided with no research-based reading interventions that

17   addressed dyslexia.  Instead, Student A was placed in a Leveled Literacy Intervention program

18   called Fountas and Pinnell, a general reading intervention provided to all students within SFUSD.

19       59.   In August 2017, Student A was placed in another reading intervention program,

20   S.P.I.R.E.  S.P.I.R.E. is a research-based, multisensory program that would provide Student A

21   with the tools she needed to progress and advance in her reading skills.  Student A utilized the

22   S.P.I.R.E. program for a few months but after Student A's teacher went on leave, SFUSD failed to

23   identify or provide another trained staff member to assist Student A.  In January 2018, SFUSD

24   informed the parents of Student A that Student A would again be offered group work using the

25   Fountas and Pinnell general reading program provided to all students.  During the remainder of

26   2017, Student A was denied aids and services that were necessary because of her dyslexia.

27       60.   As a result of SFUSD's denial of the aids and services Student A required because

28   of her dyslexia, Student A's parents were forced to locate and pay for private tutoring for Student

A. From November 2016 through December 2017, Student A attended 60-minute tutoring sessions in reading, two times per week.

61.     Thereafter in July 2017, Student A attended a literacy program in which the case manager opined that Student A could benefit from individual support in phonics, reading fluency and writing.

62.     In December 2017, Student A's parents decided to obtain and pay for an independent assessment of Student A. Student A's independent assessment showed that Student A was well below grade level for reading, writing and math.

63.     In January 2018, Student A began attending a private intensive literacy remediation program using Lindamood-Bell, a research-based reading intervention program for children with dyslexia. Student A has made great progress in her reading skills due to the intensive private reading intervention program using Lindamood-Bell she has been attending.

64.     Student A's January 2018 IEP report stated that Student A demonstrates a Fountas and Pinnell instructional reading level below grade level expectations. Student A's January 2018 IEP report also states that she demonstrates difficulty with math fluency and writing and that she struggles with sensorimotor processing and fine motor skills.

65.     As set forth herein, Defendants denied Student A services and accommodations that she needed because of her disabilities and that were necessary to a FAPE. In so doing, Defendants also denied Student A and her parents the procedural safeguards provided by IDEA, as set forth herein. During the January 2018 IEP meeting, the parents of Student A and Defendants could not reach agreement on the goals written into Student A's IEP. Student A's parents wanted Student A to achieve grade level goals, but Defendants pushed to set goals for Student A that were less than grade level.

66.     Following the January 2018 IEP meeting, SFUSD assigned Student A to a new special education teacher who had no training in working with students with dyslexia and no training on the S.P.I.R.E. program. This new teacher told Parent A that she had to "Google visual processing disorder."

67.     As a result of Defendants' failure to provide Student A with FAPE, and at significant personal expense, the parents of Student A decided to enroll her in a private school in San Francisco.  However, if SFUSD were to change its policies, procedures and practices so that they comply with the District's legal obligations under federal law, Student A would probably return to SFUSD.

## PLAINTIFF STUDENT B

68.     Student B is an eight-year-old, second grade student at a SFUSD elementary school. Student B has been diagnosed with autism and a speech or language impairment.  Student B previously attended three different SFUSD Pre-K programs.  He is entitled to special education and related aids and services from SFUSD as a resident of the City and County of San Francisco. At all relevant times, Student B has resided within the jurisdiction of SFUSD.

69.     Student B has been subjected to discrimination and denial of necessary services and accommodations as a result of, *inter alia*:  (a) Defendants' failure to properly and timely identify and evaluate students who qualify for special education services; (b) Defendants' policy and practice of providing only a limited subset of services and accommodations to students with disabilities despite the fact that other additional services and accommodations are necessary; (c) Defendants' policy and practice of failing to provide the services and accommodations specified in the IEPs of students with disabilities, or of arbitrarily limiting or rationing the amounts of such services or accommodations that are provided to them; and (d) Defendants' policy and practice of denying procedural safeguards mandated by the IDEA and its regulations.

70.     Defendants failed to timely and properly identify and evaluate Student B with respect to his disabilities, and as a result he was denied services and accommodations that he needed for his disabilities and that were necessary to a FAPE as set forth below.  Student B was diagnosed with autism at the age of two.  From the age of two until he started pre-K at SFUSD, Student B received services, including Applied Behavior Analysis, through Golden Gate Regional Center.  Due to his disability, Student B has delayed speech, sensory processing issues and gross and fine motor issues.

71.     During Pre-K, Student B received some services from SFUSD such as basic speech therapy and physical therapy.  Student B's parents also requested occupational therapy and behavioral services from SFUSD because he was not verbal and was not socializing with the other children.  During an IEP meeting, Student B's parents were told that Defendants would not provide occupational therapy and behavioral services for Student B because Defendants did not feel he was eligible.  Defendants continue to deny behavioral services, including Applied Behavior Analysis services, for Student B.

72.     Defendants denied Student B services and accommodations that he needed because of his disabilities and that were necessary to a FAPE as set forth herein.  When Defendants denied Student B behavioral services, the parents of Student B requested one-on-one time with a paraprofessional.  Defendants denied this request on the asserted basis that he was not eligible because other services were adequate to address his needs.  Because Student B was not provided with a one-on-one paraprofessional, he could not – and still cannot – fully participate in the classroom experience such as group activities and socializing with peers.  In addition, a one-on-one paraprofessional would support Student B on tasks such as climbing, manipulation of objects, puzzles, arts and crafts, and assisting with school performances requiring that he simultaneously sing and dance which Student B cannot do independently.  Therefore, Student B cannot fully participate on an equal basis as his non-disabled peers as required by applicable law.

73.     During the time in which he has been enrolled in SFUSD, Student B has been consistently denied occupational therapy services.  Instead, the parents of Student B were told that "PT will take care of it."  However, PT and OT are distinct services that address different limitations and problems and are not interchangeable.  Student B requires occupational therapy to assist with bilateral coordination and gross motor skills such as jumping, skipping, catching and throwing a ball.

74.     Student B's parents had to request an independent educational evaluation ("IEE") in order to obtain occupational therapy.  The parents of Student B had to wait months for the IEE because Defendants have a list of "approved vendors" for independent evaluations and unless the provider is on the "approved list," parents have to pre-pay thousands of dollars for the

independent evaluation.  The parents of Student B were required to have six IEP meetings to challenge SFUSD's refusal to provide basic services such as occupational therapy and physical therapy.  During the IEP meetings, district officials asserted that because Student B was doing well academically, he did not need special education and related services.

75.     Defendants have denied Student B a FAPE and denied Student B and his parents the procedural safeguards provided by IDEA.  Because Defendants consistently denied occupational therapy services to Student B, the parents of Student B arranged for him to receive private occupational therapy services, at their own expense, beginning in the Spring of 2017. Student B attends private occupational therapy services once per week which have resulted in a dramatic improvement in Student B's ability to complete basic tasks such as climbing, writing and catching a ball.

76.     As part of Student B's IEP, Defendants were required to provide him with extended school year services.  During the Summer of 2018, Student B was placed at a SFUSD elementary school with other students who receive special education and related services.  Student B was placed in a special day class for children with autism in kindergarten through third grade.

77.     Because Student B's extended school year program grouped students in different grade levels together in a single classroom, Student B regressed academically and started to engage in "baby talk" and infantile language.  During the summer of 2018, Student B did not make any academic progress towards meeting his IEP goals, and, in fact, regressed.

78.     Because of the District's ongoing refusal to provide accommodations regarding socialization and speech services, the parents of Student B, at their own expense, engaged an independent childhood educator to assist Student B with socialization and speech services. Student B's parents have incurred substantial monetary costs in doing so.  Because the parents of Student B have independently engaged and paid for this outside service, Student B has made gains in both his socialization and speech.

79.     Student B has exhibited social and behavioral problems related to his autism such as rigidity in his behavior, an unwillingness to engage in new activities and non-participation in class or interaction with his peers.  Student B's parents have repeatedly requested services to address

1  these issues, but Defendants have refused to provide autism-specific services.  In refusing to

2  provide autism-specific services, Defendants have asserted that the resource specialist can provide

3  assistance with socialization and behavior.  However, the resource specialist does not provide

4  socialization or behavior support and Student B continues to experience anxiety, isolation and

5  nervousness, all of which remain unaddressed by Defendants.

6  **PLAINTIFF STUDENT C**

7  80.    Student C is a seven year-old, first grade student enrolled at a public school in San

8  Francisco.  Student C has been diagnosed with autism and a speech or language impairment.

9  Student C has attended this SFUSD elementary school since he started kindergarten in the 2017-

10  2018 academic year.  Student C previously attended two different SFUSD Pre-K programs.  He is

11  entitled to special education and related aids and services from SFUSD as a resident of the City

12  and County of San Francisco.  At all relevant times, Student C resided within the jurisdiction of

13  SFUSD.

14  81.    Student C has been subjected to discrimination and denial of necessary services and

15  accommodations as a result of, *inter alia*, (a) Defendants' failure to properly and timely identify

16  and evaluate students who qualify for special education services; (b) Defendants' policy and

17  practice of providing only a limited subset of services and accommodations to students with

18  disabilities despite the fact that other additional services and accommodations are necessary; (c)

19  Defendants' policy and practice of failing to provide the services and accommodations specified

20  in the IEPs of students with disabilities, or of arbitrarily limiting or rationing the amounts of such

21  services or accommodations that are provided to them; and (d) Defendants' policy and practice of

22  denying procedural safeguards mandated by the IDEA and its regulations.

23  82.    At the age of 18 months, Student C started receiving speech therapy, occupational

24  therapy, physical therapy and Applied Behavior Analysis through Golden Gate Regional Center.

25  83.    Defendants failed to identify and evaluate Student B in a timely and proper manner

26  with respect to his disabilities.  As a result, he was denied services and accommodations that he

27  needed for his disabilities and that were necessary to a FAPE as set forth below.  When Student C

28  turned two and a half years old, Student C's parents asked Defendants for an evaluation of

Student C.  Student C tested on the autism spectrum, but SFUSD refused to provide him services based on an autism diagnosis.  Instead, Student C received occupational therapy, physical therapy and speech therapy based only on Student C's diagnosis of a speech or language impairment.  Student C was denied behavioral services and autism-specific services such as Applied Behavioral Analysis therapy.

84.     The parents of Student C were forced to attend three IEP meetings in order to get approved to obtain an IEE to demonstrate to Defendants that Student C was indeed autistic and required special education services.  Student C's parents initially requested an IEE during Summer 2015.  The parents of Student C had to wait until December 2015 for the IEE report and pre-pay thousands of dollars for the independent evaluation.  During this time, Student C was deprived of critical services that he was entitled to and that would have benefitted him, including but not limited to behavioral support such as Applied Behavior Analysis and paraprofessional support.

85.     Defendants have denied Student C a FAPE and have denied Student C and his parents the procedural safeguards provided by IDEA as set forth below.  Even after the parents of Student C received the independent diagnosis of autism, Defendants still refused to identify him as autistic, identifying him instead as merely having a "speech delay."

86.     Student C has consistently been denied academic support.  He was unable to write his name until the second-half of kindergarten.  In addition, Student C does not know all the alphabet and can barely count to 10.  On a standardized education test, Student C scored in the bottom 1% in basic reading skills and in the bottom 2% in academic skills.  He lags far behind his peers.  Despite repeated requests by his parents that he receive academic supports in math and language development that are necessary to address these deficiencies, the District has failed and refused to provide these services.  Moreover, the District has denied requests by Student C's parents that he be tested for a suspected learning disability on the purported basis that Student C has not been identified as having a learning disability.  In fact, Student C's parents were told that these issues could not be addressed until Student C enters the third grade, thus denying Student C

a FAPE.  If Student C continues to be denied academic support services, he will fall even further behind his peers and will not learn how to read.

87.    Student C also had behavioral problems related to his autism including difficulty participating in circle time and completing class projects.  While he receives limited paraprofessional support for part of the day, Student C has not received any autism-specific services, such as Applied Behavior Analysis therapy, to address these issues.  As a result, he continues to experience problems related to attention, project completion and meaningful class participation.

88.    The parents of Student C have obtained and pay for private occupational therapy sessions because Defendants refuse to provide more than 30 minutes of occupational therapy per week on the purported basis that 30 minutes is "the standard" and the Least Restrictive Environment for Student C.  Student C's parents have witnessed firsthand the positive effects that the additional occupational therapy sessions have had on Student C's skills and abilities, including valuable skills such as throwing a ball, holding a pencil and buttoning up a shirt.

**PLAINTIFF STUDENT D**

89.    Student D is a twelve year-old, sixth grade student at a public school in San Francisco. Student D has been diagnosed with a SLD in the areas of reading (dyslexia).  Student D previously attended two SFUSD elementary schools.  She is entitled to special education and related aids and services from SFUSD as a resident of the City and County San Francisco.  At all relevant times, Student D resided within the jurisdiction of SFUSD.

90.    Student D has been subjected to discrimination and denial of necessary services and accommodations as a result of, *inter alia*, (a) Defendants' failure to properly and timely identify and evaluate students who qualify for special education services; (b) Defendants' policy and practice of providing only a limited subset of services and accommodations to students with disabilities despite the fact that other additional services and accommodations are necessary; (c) Defendants' policy and practice of failing to provide the services and accommodations specified in the IEPs of students with disabilities, or of arbitrarily limiting or rationing the amounts of such

services or accommodations that are provided to them; and (d) Defendants' policy and practice of denying procedural safeguards mandated by the IDEA and its regulations.

91.     Defendants failed to timely and properly identify and evaluate Student B with respect to her disabilities, and as a result she was denied services and accommodations that she needed for her disabilities and that were necessary to a FAPE as set forth below. When Student D was in the first grade, she was referred by her teacher to a reading intervention program ("reading club"). Student D was identified as a good candidate for reading club because she was not performing at grade level for reading and writing. Student D attended reading club twice a week for 20-30 minutes.

92.     By the middle of second grade, Student D's teacher determined that Student D "graduated" from reading club. Student D's parents were told that Student D had made some progress, would not make additional progress, and would not benefit from reading club any longer.

93.     In the second grade, Student D was also identified as a candidate for both group and one-on-one emotional learning support. She participated in emotional learning support sessions during which she would meet with the school social worker and discuss her feelings and to relax from the stress of school. These group and individual emotional support sessions were later discontinued purportedly due to funding issues.

94.     Student D was consistently placed in the lower performing groups academically in school. Student D's parents were told during parent-teacher conferences that she is "just slower," "a nice kid," and "shy."

95.     Due to a large drop in her confidence and self-esteem resulting from her relatively poor academic performance caused by Defendants' failure to provide the services and accommodations necessary for her disabilities, Student D also started having more difficulties with friendships and often felt alone and isolated.

96.     In November 2017, Student D's parents requested a psychoeducational assessment for Student D's sibling who was subsequently diagnosed with dyslexia. Because Student D's parents understood that dyslexia is genetic, Student D's parents requested a psychoeducational

assessment of Student D in December 2017 to determine eligibility for special education and related services.

97.     In December 2017, Student D started therapy to help with anxiety and low self-esteem and confidence.

98.     In February 2018, Defendants completed an initial psychoeducational assessment of Student D.  Based on the assessment, Student D was determined to meet the eligibility criteria for a Specific Learning Disability.  The psychoeducational report states that Student D demonstrates a normative weakness in academic achievement in reading comprehension, reading fluency, and written expression and that she demonstrates a processing deficit in cognitive abilities.

99.     Defendants have denied Student D a FAPE and have denied Student D's parents the procedural safeguards required by IDEA as set forth below.  Student D's initial IEP meeting was scheduled in February 2018.  Student D's IEP report states that she requires assistive technology devices and/or services to support fluency, comprehension and written expression needs and goals, including access to AT tools:  audiobooks, Text-to-Speech, Speech-To-Text and word prediction for spelling and writing. Despite the foregoing, no assistive technology services or devices were provided to Student D by SFUSD while she was enrolled at her elementary school.

100.    Since implementing Student D's IEP, Defendants did not meet or consistently work towards the goals written into Student D's IEP report.  For example, Student D did not receive books on tape or recorded books and did not receive a calculation device.

101.    In addition, SFUSD failed to allocate the appropriate time to meet Student D's goals.  The parents of Student D repeatedly had to ask the resource specialist to work with Student D.  On many occasions, the resource specialist had meetings and could not meet with Student D.  When there were field trips, standardized testing or other events, SFUSD did not make up the time for which Student D was required to receive specialized academic instruction.  Student D would have to meet with the resource specialist during lunch so that she could get time with the teacher.

102.    Defendants failed to provide or ensure that Student D's teachers had sufficient training and staff support to implement the services, accommodations and goals written into

Student D's IEP.  Rather, Student D's teachers often expected the resource specialist to be primarily responsible for progress towards Student D's goals.

103.    Because of Defendants' failure to provide the required support and services to Student D, the parents of Student D have paid substantial amounts of their own money for private math and reading and writing tutors to ensure that Student D can progress academically and to assist with her anxiety and low self-esteem.

104.    Defendants missed the indicators that Student D had a disability as early as the first grade.  Defendants never referred Student D for an evaluation to determine whether she would qualify for special education and related aids and services.  Due to SFUSD's failure to properly refer Student D for an evaluation, Student D lost many years of special education and related services that would have allowed her to progress academically and socially.  Moreover, Defendants have routinely failed and refused to provide Student D with services and accommodations to which she is entitled and that were necessary to a FAPE.

**PLAINTIFF STUDENT E**

105.    Student E is an eight year-old, third grade student at a public school in San Francisco.  Student E has been diagnosed with a SLD in the areas of reading (dyslexia).  Student E has attended this SFUSD elementary school since she started kindergarten in the 2015-2016 academic year.  She is entitled to special education and related aids and services from SFUSD as a resident of the City and County San Francisco.  At all relevant times, Student E resided within the jurisdiction of SFUSD.

106.    Student E has been subjected to discrimination and denial of necessary services and accommodations as a result of, *inter alia*, (a) Defendants' policy and practice of providing only a limited subset of services and accommodations to students with disabilities despite the fact that other additional services and accommodations are necessary; (b) Defendants' policy and practice of failing to provide the services and accommodations specified in the IEPs of students with disabilities, or of arbitrarily limiting or rationing the amounts of such services or accommodations that are provided to them; and (c) Defendants' policy and practice of denying procedural safeguards mandated by the IDEA and its regulations.

CLASS ACTION COMPLAINT
*Student A., et al. v. San Francisco Unified School District*

107.    Defendants failed to identify and evaluate Student E in a timely and proper manner as required by applicable law, and as set forth below.  In February 2018, Defendants completed an initial psychoeducational assessment of Student E.  Based on the assessment, Student E was determined to meet the eligibility criteria for a Specific Learning Disability.  Student E's disabilities, however, had manifested during the two years prior to her initial assessment including Student E not meeting reading and writing standards and outcomes, challenges with decoding words and being referred to a reading intervention program by her teacher.  Student E was consistently placed in the lower performing groups.  Further, when Student E's parents raised the issue of dyslexia, they were told by District personnel that assessing Student E too early would not show a large enough discrepancy in her educational achievement, that she would not qualify for a SLD, and that Student D would not then be able to be assessed at a later date.  As a result of Defendants' failure to identify and evaluate Student E is a timely and proper manner, she was denied services and accommodations that she needed because of her disabilities and that were necessary to a FAPE.

108.    In January 2019, Student E's IEP report stated that Student E requires Speech to text support to address her dyslexia, which greatly affects her writing speed through spelling errors.  Student E's IEP report required the District to provide 95 minutes per week of reading group, 45 minutes per week of math group, and 30 minutes per week of writing group.  Student E's IEP also required push in and pull out services to support reading, writing and math and that the District provide 65 minutes per week of individual reading support, 35 minutes per week of individual writing support and 30 minutes per week of individual math support.

109.    Defendants have routinely failed to provide the services and accommodations specified in Student E's IEP.  SFUSD failed to allocate the appropriate time to meet Student E's goals.  The parents of Student E repeatedly had to ask the resource specialist to work with Student E.  On many occasions, the resource specialist had meetings and could not meet with Student E.  When there were field trips, standardized testing or other events, SFUSD did not make up the time for which Student E was required to receive specialized academic instruction.

110.    Defendants failed to provide or ensure that Student E's teachers had sufficient training and staff to implement the services, accommodations and goals written into her IEP. Rather, Student E's teachers often expected the resource specialist to progress towards Student E's goals.

111.    Based on assessments completed by the resource specialist, Student E was placed in a group that was below Student E's curriculum level.  However, when the parents of Student E inquired about moving her to a different group that was in line with Student E's academic performance and the school's own assessments, they were told that it was not "convenient" to move her to a different group, and she continued in a group that was below her level for several months until it was convenient to move her to another group which was consistent with her assessments and abilities.

112.    Defendants have denied Student E a FAPE and have denied Student E and his parents the procedural safeguards provided by IDEA as set forth herein.  Because SFUSD has not implemented the specialized academic instruction time, services and accommodations stated in Student E's IEP report, the parents of Student E have been forced to pay out of their own funds for private, outside support in order to give Student E an opportunity to progress academically.

## DEFENDANTS' UNLAWFUL POLICIES AND PRACTICES

113.    Defendants' policies and practices violate the IDEA, Section 504 and the ADA in at least the following ways:

114.    **Defendants' failure to properly and timely identify students who qualify for special education services**.  Defendants have systematically declined and failed to timely identify, evaluate and provide appropriate interventions and accommodations to students with disabilities.  Defendants have failed to put into effect policies, procedures and programs that ensure that all students with suspected disabilities are timely identified, located, evaluated and provided appropriate special education and related aids and services, and monitored to ensure FAPE.  For example, Defendants maintain policies and practices that, *inter alia,* actively discourage parents from requesting evaluations or requesting particular services or accommodations, often forcing families to seek private evaluations at their own expense, if they

can.  Students with disabilities can only progress through school if they are identified early and provided the necessary, appropriate and required interventions and accommodations.

115.   **Defendants' policy and practice of rationing specialist services needed by students with disabilities**.  Defendants have a policy and practice of rationing services in the areas of literacy and/or reading, occupational therapy, speech and language therapy, physical therapy, and other services in order to comply with arbitrary and unnecessary budget limitations.  By doing so, Defendants fail to ensure the provision of related services that a student with a disability may need in order to benefit from their education.  Defendants' deprivation of educational services, through the rationing of specialist services, has a lasting detrimental impact on a student's ability to progress academically.

116.   **Defendants' policy and practice of providing a one-size-fits-all or limited "menu" of accommodations or services**.  Defendants have a policy and practice of offering students with disabilities only a limited selection of potential reasonable accommodations and services, and do not pro-actively disclose to parents and their children the full range of potential reasonable accommodations and services that are available to provide effective educational opportunities and progress to them.  To receive FAPE, students with disabilities typically require special education services, such as appropriately intensive research-based interventions, related services, supplementary aids and services, and curricular accommodations and modifications as provided by law.  Defendants employ blanket policies or practices that set services and delivery by rules or other administrative criteria as opposed to individualized determinations based on the disclosure to the parents and students with disabilities of the full range of potential reasonable accommodations and services that are available to address students' disabilities. Such discriminatory policies and practices result in a denial of FAPE.

117.   **Defendants' policy and practice of imposing arbitrary limits or ceilings on the amount of certain types of services and accommodations**.  Defendants have a policy and practice of using pre-set limits on the number of minutes or amount of time for which a particular type of service or accommodation is provided to students with disabilities.  For example, students with disabilities are arbitrarily limited to a maximum of 30 minutes or 45 minutes of certain types

of services without regard to whether such arbitrary limits are sufficient to meet the educational needs of students with disabilities, thus denying FAPE.  Services should be provided based on a student's individual educational needs for services that are sufficient to ensure progress within the meaning of applicable law.  Moreover, as a result of Defendants' policy and practice of imposing pre-determined and arbitrary limits on the amount of services and accommodations provided to students with disabilities, parents of students with disabilities are denied their right to meaningfully participate in the development and implementation of the student's IEP and services based on an individual assessment of the amount of accommodations and services that are necessary to provide a FAPE to their children.

118.  **Defendants' failure and refusal to commit sufficient resources for its special education program**.  Defendants systemically fail to provide staff members who are qualified and trained in meeting the needs of students with disabilities.  Defendants' staffing deficiencies are well-known, and are widespread.  Because of Defendants' failure to employ a sufficient number of qualified and trained special education teachers, specialists and paraprofessionals, many students are not receiving the mandatory services set forth in their IEPs.  For example, Defendants routinely fail to provide students with dyslexia with properly trained and qualified reading specialists, and routinely fail to provide qualified and trained paraprofessionals for students with disabilities who need one-to-one aides.

119.  **Defendants' failure to provide safeguards to students and their parents.** Defendants routinely fail to ensure that students with disabilities and their parents are provided procedural safeguards mandated by the IDEA and its regulations.  For example, Defendants consistently fail to provide the required written notice to parents when it refuses to evaluate and appropriately serve students with disabilities.  Defendants further fail to ensure that parents are afforded an opportunity to meaningfully participate in decisions regarding evaluations, eligibility, and the development of their child's IEP.

//

**CLASS ALLEGATIONS**

120.    The named Plaintiffs bring this action on behalf of themselves and all persons similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) as set forth below.

121.    **Class Definition.**  Plaintiffs seek to represent the following class:  All students within the jurisdiction of San Francisco Unified School District who have or may have disabilities and who have been or will be subject to the District's policies and procedures regarding the identification and evaluation of students with disabilities and the provision of services and/or accommodations to such students under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973 and/or Title II of the Americans with Disabilities Act of 1990 during the class period.

122.    The class period is defined as commencing two years prior to the filing of this action through the present.

123.    Excluded from the above-referenced class are any judges assigned to hear this case (or any spouse or family member of any assigned judge).

124.    **Impracticability of Joinder (Numerosity of the Class).**  The members of the proposed class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to this Court. Defendants' own records and information show that the class consists of approximately 7,000 students who reside in San Francisco.  Accordingly, Defendants' policies and practices regarding students with disabilities impact thousands of current and future students.

125.    **Questions of Fact and Law Common to the Class.**  All members of the class have been and continue to be denied their civil rights because of the violations of the IDEA, Section 504 and/or the ADA alleged herein.  There are questions of law and fact common to the class defined above, namely with Defendants' policies, procedures and practices regarding the identification, evaluation, eligibility determination, provision of special education and related services, and monitoring of student progress to determine effectiveness of services provided and need for further evaluation and/or revision to their IEPs or 504 Plans, violate IDEA, Section 504

and the ADA.  Questions of law and fact common to the class include, but are not limited to, the following:

    a.   Whether Defendants' policies, procedures and practices regarding the identification and evaluation of students with disabilities comply with the requirements of the IDEA, Section 504 and/or the ADA;

    b.   Whether Defendants' policy and practice of rationing specialist services needed by students with disabilities complies with the requirements of the IDEA, Section 504 and/or the ADA;

    c.   Whether Defendants' policy and practice of providing a one-size-fits-all or limited "menu" of accommodations or services to students with disabilities complies with the requirements of the IDEA, Section 504 and/or the ADA;

    d.   Whether Defendants' policy and practice of imposing arbitrary across-the-board limits or ceilings on the amount of particular types of services or accommodations provided to students with disabilities without regard for the need for such services and accommodations by the class members complies with the requirements of the IDEA, Section 504 and/or the ADA;

    e.   Whether Defendants' policy and practice of failing and refusing to commit sufficient financial and personnel resources to its special education program to meet the aggregate needs of the class members for such services and accommodations complies with the requirements of the IDEA, Section 504 and/or the ADA;

    f.   Whether Defendants' policies, procedures and practices regarding providing services and accommodations to students with disabilities comply with the procedural safeguards mandated by the IDEA and its regulations;

    g.   Whether Defendants, by their actions and omissions alleged herein, have engaged in a policy, pattern and/or practice of discrimination against Plaintiffs and the putative class members in violation of the IDEA, Section 504 and/or the ADA;

h. Whether the Plaintiffs and the putative class members have been injured; and

i. Whether the Plaintiffs and the members of the putative class are entitled to declaratory and/or injunctive relief, and the nature of such relief.

126. **Typicality.** The claims of the named Plaintiffs are typical of those of the proposed class. Each of the named Plaintiffs is an individual with a disability that qualifies him or her as eligible for special education and related services under IDEA, Section 504 and/or the ADA. Further, Plaintiffs have been and are being denied their right to a FAPE by Defendants. Plaintiffs' claims are typical of the claims of the proposed class in the following ways: 1) Plaintiffs are members of the proposed classes; 2) Plaintiffs' claims arise from the same policies, procedures, practices and course of conduct on the part of Defendants; 3) Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed class and involve similar factual circumstances; 4) the injuries suffered by the named Plaintiffs are similar to the injuries suffered by the proposed class members; and 5) the relief sought herein will benefit the named Plaintiffs and all class members alike.

127. **Adequacy.** The named Plaintiffs will fairly and adequately represent the interests of the classes. They have no interests adverse to the interests of other members of the class and have retained counsel who are competent and experienced in litigating complex class actions, including large-scale disability rights class action cases.

128. **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted and refused to act on grounds generally applicable to the class, making the declaratory and injunctive relief sought on behalf of the class as a whole appropriate.

129. **Exhaustion of Administrative Remedies Would Be Futile.** Plaintiffs cannot exhaust their educational due process administrative remedies because it would be futile and impossible to do so. Exhaustion through individual due process claims is impossible because the harms that the individual Plaintiffs allege and the remedies they seek are systemic and impact both the named Plaintiffs and all of the putative class members. Systemic deficiencies are not capable of review in a particular student's due process claim, nor is systemic relief available as a remedy in such a case. Thus, any effort to exhaust for the individual Plaintiffs would be futile.

**LEGAL CLAIMS**
**First Claim for Relief**
**Violations of the IDEA, U.S.C. §§ 1400, *et seq.*,**
**34 C.F.R. Pt. 300**
**(On Behalf of All Plaintiffs, Class Members)**

130.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

131.    IDEA mandates that students with disabilities, between ages 3 and 21, have access to a FAPE.  20 U.S.C. § 1412(a)(1)(A).  Students with suspected disabilities are entitled to a full and individual evaluation under IDEA.  *Id*. § 1412(a)(7), 20 U.S.C. §§ 1414(a)- (b).  Upon evaluation and determination of eligibility for special education and related services, IDEA mandates the development and subsequent monitoring of a specially designed IEP to ensure that appropriate educational services, including specialized instruction, such as appropriately intensive research-based reading interventions, related services, supplementary aids and services, based on peer-reviewed research to the extent practicable; accommodations and modifications, assistive technology and accessible materials are provided to students with disabilities as needed to ensure a FAPE in the LRE.  20 U.S.C. § 1414(d).  Child and parental input must be taken into account.  *Id*. § 1414 (a)(1)(D), (b); 34 C.F.R. Pt. 300.

132.    All Plaintiffs and Class Members are or may be a "child with a disability" within the meaning of applicable law and need or may need special education and related services.

133.    Defendants are recipients of federal funds under the IDEA sufficient to invoke coverage under the IDEA.  20 U.S.C. § 1412(a).

134.    As set forth above, Defendants' policies and practices regarding students with disabilities constitute a persistent and systemic failure to meet the requirements of IDEA.

135.    Thus, Defendants have deprived each Plaintiff and has or may deprive the Class Members of a FAPE.

136.    As a direct and proximate result of Defendants' violations, each Plaintiff has suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

137. No administrative remedy exists under IDEA or its implementing regulations to address these wholesale and systemic violations by Defendants.

138. Due to Defendants' ongoing violations of IDEA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

139. WHEREFORE, Plaintiffs and the putative Class pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**
**Violations of Section 504, 29 U.S.C. § 794**
**34 C.F.R. Pt. 104**
**(On Behalf of All Plaintiffs, Class Members)**

140. Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

141. Section 504 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); *see* 34 C.F.R. §§ 104.4(b), .21, .43(a).

142. Section 504 mandates that a student who is eligible for special education and related services under Section 504 is entitled to receive FAPE. 34 C.F.R. § 104.33.

143. All Plaintiffs are and Class Members are or may be qualified individuals with disabilities within the meaning of Section 504 and are or may be otherwise qualified to participate in or receive benefits from Defendants' programs or activities. 29 U.S.C. § 794(a).

144. Defendants have been and are a recipient of federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(3).

145. As set forth above, Defendants' policies and practices regarding students with disabilities constitute a persistent and systemic failure to meet the requirements of Section 504 and discriminate against all Plaintiffs and Class Members, solely by reason of their disability in violation of Section 504.

146. Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE.

147.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

148.    Due to Defendants' ongoing violations of Section 504 and implementing regulations, injunctive and declaratory relief are appropriate remedies.

149.    WHEREFORE, Plaintiffs and the putative Class pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**Disability Discrimination - Violation of Title II of the ADA**
**42 U.S.C. §§ 12131, *et seq.***
**28 C.F.R. § 35.130**
**(On Behalf of All Plaintiffs, Class Members)**

150.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

151.    Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity."  42 U.S.C. § 12132; *see* 28 C.F.R. §§ 35.130(a), (b)(1)-(3), (b)(7)-(8), (d).

152.    Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA.  42 U.S.C. § 12131(1).

153.    All Plaintiffs are, and all Class Members are or may be, qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants.  *Id*. § 12131(2).

154.    As set forth above, Defendants' practices regarding students with learning disabilities constitute a persistent and systemic failure to meet the requirements of Title II of the ADA and discriminate against all Plaintiffs and Class Members, by reason of their disability in violation of the requirements of the ADA by denying all Plaintiffs and Class Members an equal and equally effective educational opportunity in the most integrated setting appropriate, and instead providing all Plaintiffs and Class Members with a separate, different, and inferior educational experience.

155.   As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

156.   Due to Defendants' ongoing violations of Title II of the ADA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

157.   WHEREFORE, Plaintiffs and the putative Class pray for relief as set forth below.

### ALLEGATIONS SUPPORTING DECLARATORY RELIEF

158.   Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

159.   As set forth above, an actual controversy has arisen and now exists between the parties in that all Plaintiffs and Class Members contend, and Defendants deny, that Defendants maintain practices that discriminate against students with and suspected to have disabilities and deprives them of a FAPE, and that Defendants routinely fail to comply with the requirements of IDEA, 20 U.S.C. §§ 1400, *et seq*., and its implementing regulations; Section 504, 29 U.S.C. § 794, and its implementing regulations; and Title II of the ADA, 42 U.S.C. §§ 12132, *et seq*., and its implementing regulations.

160.   A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and act accordingly.

161.   WHEREFORE, Plaintiffs and the putative Class request relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the putative Class pray for relief as follows:

(a.)   An order certifying this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) appointing Plaintiffs as Class Representatives of the Class and their attorneys as Counsel for the Class.

(b.)   Declare that Defendants' policies, procedures and practices regarding students with and who are suspected to have disabilities violate the rights of all Plaintiffs and Class Members, under IDEA, Section 504, and Title II of ADA.

1     (c.)    Issue preliminary and permanent injunctions pursuant to IDEA, Section 504, and

2             the ADA that enjoin Defendants, their successors in office, agents, employees and

3             assigns, and all persons acting in concert with them to promulgate compliant

4             policies, procedures and practices.

5     (d.)    Order Defendants to develop and implement a remedial plan that includes new

6             practices, policies, and procedures to ensure that all students in the Plaintiff Class

7             are identified and evaluated in a timely manner, and that they receive their special

8             education services.

9     (e.)    Order Defendants to develop and implement a policy and procedure for pro-actively

10            notifying parents of students with disabilities of the full range of available

11            accommodations and services that may be effective in ensuring that their children

12            achieve progress within the meaning of applicable law and receive FAPE.

13    (f.)    Order that Defendants cease their policy and practice of imposing arbitrary limits

14            and ceilings on the provision of amounts of certain types of accommodations and

15            services thereby denying FAPE.

16    (g.)    Order that all SFUSD staff that provide services and accommodations to the

17            Plaintiff Class members receive appropriate training.

18    (h.)    Order that Defendants' compliance with the IDEA, Section 504 and the ADA be

19            monitored by independent experts.

20    (i.)    Retain jurisdiction of this case until Defendants have complied with the orders of

21            this Court.

22    (j.)    Award the named Plaintiffs restitution as well as pre-judgment and post-judgment

23            interest according to law as compensation for the out-of-pocket costs and expenses

24            incurred by them in paying for services and accommodations provided by non-

25            SFUSD personnel as a result of Defendants' failure and refusal to provide services

26            and accommodations as required by applicable law.

27

28

(k.)  The named Plaintiffs seek compensatory services on an individual basis for the denial of their rights under the IDEA, Section 504 and the ADA as part of an equitable remedy.

(l.)  An order awarding Plaintiffs reasonable attorneys' fees and costs, as authorized by statute and law; and

(m.)  For such other and further relief as this Court may deem just and proper.

Date: June 4, 2019                         Respectfully submitted,


                                           /s/ Guy B Wallace
                                           Guy B. Wallace
                                           Mark T. Johnson
                                           Travis C. Close
                                           SCHNEIDER WALLACE
                                           COTTRELL KONECKY
                                           WOTKYNS LLP


                                           /s/ Jinny Kim
                                           Jinny Kim
                                           Alexis Alvarez
                                           LEGAL AID AT WORK


                                           /s/ Shawna L. Parks
                                           Shawna L. Parks
                                           LAW OFFICE OF SHAWNA L. PARKS


                                           Counsel for Plaintiffs